**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Capitol Specialty Insurance Corporation, | No. CV-21-00858-PHX-DJH |
| Plaintiff, | **ORDER** |
| v. | |
| Colorado River Consulting Incorporated, et al., | |
| Defendants. | |

At issue in this matter is whether an insurance policy provides coverage for property damage claims arising out of claims for negligent agricultural pest control consulting services, and if not, whether the insured's broker can be found professionally negligent in failing to procure adequate coverage for the insured. Several motions are pending before the Court, including motions for summary judgment filed by the insurer and the insured's broker. With one exception for which the Court requires further briefing, all the motions will be denied.[1]

## I.     Procedural Background

In May 2021, Plaintiff Capitol Specialty Insurance Corporation ("Capitol") filed a Complaint (Doc. 1) seeking a declaratory judgment that it was not contractually obligated to defend or indemnify insured Defendants Jeffrey Nigh and his business Colorado River Consulting, Inc. ("CRC") (collectively, "Nigh"), for claims asserted by Calyxt, Inc.

---

[1] The request for oral argument is denied because the issues are fully briefed and argument will not aid the Court's decision. *See* Fed. R. Civ. P. 78(b); *Partridge v. Reich*, 141 F.3d 920, 92 (9th Cir. 1998).

("Calyxt") against Nigh in *Calyxt, Inc. v. Morris Ag Southwest, LLC*, No. 2:20-cv-01221-DLR (D. Ariz. June 18, 2020), pending in the United States District Court for the District of Arizona ("Underlying Action").  In response, Nigh counterclaimed (Doc. 15), seeking a declaration that Capitol is obligated to defend and indemnify him in the Underlying Action. Nigh also brought a Third-Party Complaint against his insurance broker, Third Party Defendant Cal Valley Insurance Service Inc. ("Cal Valley"), alleging that Cal Valley breached its professional duties in procuring the insurance policy on his behalf.  (*Id*. at 3–4).  Nigh seeks indemnity from Cal Valley if the Court finds that Capitol is not obligated under the terms of the policy.  (*Id*.)

Discovery has concluded.  Capitol has moved for summary judgment on its declaratory judgment claim against Nigh, CRC, and Calyxt (collectively, "Defendants"). (Docs. 95–100).[2]  Cal Valley also seeks summary judgment on Nigh's professional negligence claims (Doc. 101),[3] and relatedly moves to strike Nigh's disclosure of his commercial insurance broker expert, Mr. Jeff Jamieson, as untimely and improper (Doc. 84).[4]  Finally, on November 7, 2023, Defendants filed a Motion to Amend seeking to add a counterclaim for bad faith failure to settle against Capitol in the Underlying Action

---

[2] Calyxt filed a Response to that Motion (Doc. 105) to which Nigh and CRC joined (Doc. 106), and Capitol filed a Reply (Doc. 111).  Third-Party Defendant Cal Valley also responded to Capitol's Motion under Fed. R. Civ. P. 14(a)(2)(C) (Doc. 107). Capitol subsequently moved to strike Cal Valley's Response on the grounds that it lacks standing. (Doc. 110).  The Court will summarily deny Capitol's Motion to Strike (Doc. 110).  Under Fed. R. Civ. P. 14(a)(2)(C), a third-party defendant like Cal Valley is entitled to raise the same defenses available to an original defendant.

[3] Calyxt filed a Response (Doc. 103), to which Nigh and CRC again joined (Doc. 104), and Cal Valley replied (Doc. 112).

[4] Both Nigh and Calyxt filed Responses (Docs. 85; 86) and Cal Valley Replied (Doc. 88).

After briefing on the Motion to Strike concluded, Calyxt sought leave from the Court to file Mr. Jamieson's entire deposition transcript (Doc. 89), noting portions were referenced in the briefing on the Motion to Strike.  Therein Calyxt stated that it "believes the Court may wish to review the transcript for itself" as it "consists of just 60 pages."  (Doc. 89). That Motion has been briefed (Docs. 113; 144) and will be summarily denied. Calyxt fails to identify what specific portions of the transcript were referenced in the briefing that it wishes the Court to review, and thus shows no good cause to file the entirety of the transcript.  It is not the Court's role to "hunt for facts or theories that might support either party's case."  (Doc. 19 n.1).

1  (Doc. 115).  Defendants indicate the Motion to Amend is opposed, but Capitol has not filed
2  a response.

3  **II.    Factual Background**

4       The following facts are undisputed or recounted in the light most favorable to the
5  non-moving party—here, Nigh.  *Ellison v. Robertson*, 357 F.3d 1072, 1075 (9th Cir. 2004).

6       **A.    Mr. Nigh's Business and Relationship with Cal Valley**

7       Nigh is an Arizona-licensed pest control advisor and has been in the business of
8  providing agricultural pest control consulting and recommendation services to farmers and
9  aerial applicators in the Yuma, Arizona region for more than 25 years.  (Oct. 7, 2022,
10 Deposition of Jefferey M. Nigh ("Nigh Dep."), Doc. 103-2 at 10:1–11:25).[5]  Nigh owns
11 and is the President of CRC.  (*Id.* at 9:6–15).  Apart from his wife, who does his billing,
12 Nigh is CRC's sole employee.  (*Id.* at 9).  Nigh operates the service out of his home, and
13 his communications with clients are either electronic or over the phone.  (Nigh Dep., Docs.
14 101-1 at 35, 37, 41; 103-2 at 98).

15      Since 1997, Cal Valley, and its predecessor, Sanford & Gilbert, has served as Nigh's
16 insurance broker.  (Nigh Dep., Doc. 103-2 at 9–10).  Nigh says he originally asked Sanford
17 & Gilbert for help obtaining an errors and omissions ("E&O") policy for CRC, which Nigh
18 understood would cover him for damages arising out errors and omissions he may make in
19 proscribing pesticides to area growers.  (*Id.* at 10:18–24; Nigh Dep., Doc. 95-1 at 28).  Nigh
20 said he relied entirely on Cal Valley to provide him with his insurance needs because the
21 "insurance stuff" was "way over [his] head."  (Nigh Dep., Docs. 103-2, 66:5–7, 88:19–20,
22 44:14–15; 95-1 at 90, 95; 101-1 at 38).  Cal Valley's insurance industry expert, Mr. Dale
23 Crawford, agreed that "Mr. Nigh relied on Cal Valley's experience and expertise in
24 securing proper insurance coverage for Mr. Nigh and CRC."  (June 1, 2023, Deposition of
25 Dale Crawford ("Crawford Dep."), Docs. 103-5 at 38:10–18), and that it was reasonable

26

---

27  [5] The parties have attached various portions of Nigh's October 7, 2022, deposition
   testimony to their Motions.  *See* Docs. 95-1 at 75–117 (Capitol's Motion for Summary
28  Judgment); Doc. 101-1 at 33–41 (Cal Valley's Motion for Summary Judgment); 103-2 at
   1–27 (Calyxt's Response to Cal Valley's Motion for Summary Judgment); Doc. 107-1 at
   24–26.

for him to do so.  (*Id.* at 83:13–15).

Each year, starting in March 19, 2010, through the present, the liability policy that Cal Valley recommended Nigh purchase for CRC was a "Miscellaneous E&O Policy" issued by Capitol.  (Doc. 95-1).  Mr. Crawford explained that a miscellaneous E&O policy covers errors and omissions for various types of professional services and differs from a commercial general liability policy, which typically contains exclusions for professional services.  (Crawford Dep., Docs. 103-6, at 31:1–32:2; 101-1 at 54).

Every one of the eleven policies that Cal Valley recommended Nigh purchase, including the policy year at issue, contained an exclusion for claims arising out of property damage that said, "The Company is not liable for Damages or Claim Expenses or obligated to defend Claims arising out of actual or alleged: 1. Bodily Injury or Property Damage;" (Docs. 95-1 at 6; 96 at 6, 23, 44, 61, 77; 97 at 6; 98 at 6, 49; 99 at 39, 79).  In 2019 and 2020, Capitol added an endorsement titled the "Agricultural Consultant Change Endorsement," which replaced the blanket property damage exclusion in the body of the Policy with one that excluded claims arising out of property damage unless CRC "maintain[s], during this Policy Period, Commercial General Liability ["CGL"] insurance with a minimum of limit of liability of $1,000,000 that includes products/completed operations coverage and applies to all of the Insured's operations."  (Docs. 95-1 at 16; 99 at 89).  In reviewing the Agricultural Consultant Change Endorsement, Mr. Crawford stated that the plain language of the Policy still excluded claims arising out of property damage, but allowed the insured to have coverage for claims arising out of property damage if it satisfied the condition precedent of procuring the specified CGL coverage.  (Crawford Dep., Docs. 103-4, at 42:20–43:22; 101-1 at 56).

Nigh testified that Cal Valley never explained to him that the Miscellaneous E&O Policy contained an exclusion for claims arising out of property damage, the effect of the addition of the Agricultural Consultant Change Endorsement to the 2019 and 2020 Policy, or CRC's option to purchase CGL coverage.  (Docs. 103-2, Nigh Dep. at 66:5–20, 74:15–24, and 80:5–13; 95-1 at 90–92).  There is no evidence in the record that Cal Valley

questioned Capitol about the property damage exclusion, asked it to remove it, or otherwise tried to procure liability coverage for Night from another carrier that would not contain a similar exclusion.  (Docs. 103-4, Crawford Dep. at 39:1–5 and 90:5–21; 101-1 at 55).  Nigh said he wrote Cal Valley a check for $2,193.00 to bind coverage for policy year 2020 based on "20 years of experience" using Cal Valley as his reliable broker.  (Doc. 103-2 at 84:9–22).

**B.    The Underlying Action and Nigh's Tender to Capitol**

On June 18, 2020, Calyxt filed a complaint against Nigh and others in the Underlying Action.  Underlying Action, ECF No. 1; *see also* Doc. 1-1.  Calyxt amended that Complaint on February 11, 2021.  *Id*., ECF No. 92; *see also* Doc. 1-2.  In its Amended Complaint, Calyxt alleges that it began developing a high fiber wheat product in 2015.  (*Id*., ECF No. 1 at 7–8).  As part of that development, in October 2019, Calyxt planted its wheat seeds in two fields in Somerton, Arizona.  (*Id.*)  Calyxt alleges Nigh was negligent in providing his pest control consulting and recommendation services in connection with an aerial application of the pesticide Clethodim on a field adjoining one of the two fields.  (*Id.* at 9–23).

On June 26, 2020, Nigh tendered the Underlying Action to Capitol for defense and indemnity.  (Doc. 95 at 13).  On July 20, 2020, Capitol denied Nigh's tender.  (Doc. 100 at 74–77).  Nigh retendered after Calyxt filed its Amended Complaint.  On April 14, 2021, Capitol again denied Nigh's tender saying "the Property Damage Exclusion and the Pesticide Application Exclusion exclude the Claim from coverage."  (Doc. 95-1 at 72–73).  Capitol then filed this action seeking a declaration of no coverage.

In the Underlying Action, on November 22, 2022, Calyxt made a settlement demand of $1,000,000, the policy limits to Nigh.  (Doc. 115 at 1).  Nigh communicated that demand to Capitol and requested Capitol accept the settlement.  (*Id.*)  Capitol refused.  (*Id.*)  Calyxt renewed its $1 million settlement demand to Nigh on July 10, 2023.  (*Id.*)  Nigh again demanded Capitol accept; Capitol again refused.  (*Id.*)

On September 26, 2023, pursuant to an Agreement, Assignment, and Covenant Not

to Execute (the "Agreement"), a judgment in the amount of $1,800,000 was entered against Nigh in the Underlying Action,  Underlying Action, ECF No. 269.  Pursuant to the Agreement, Nigh and CRC assigned their claims against Capitol to Cibus, Inc., Calyxt's successor.  (Doc. 115 at 3).

As of November 2, 2022, Capitol agreed to provide Nigh with a defense in the Underlying Action but continues to deny it has a contractual obligation to do so.  (Doc. 95 at 13).

**III.    Legal Standards**

A party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Summary judgment is appropriate if the evidence, viewed in the light most favorable to the nonmoving party, shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  Summary judgment is also appropriate against a party who "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.  Only disputes over facts that might affect the outcome of the suit will preclude the entry of summary judgment, and the disputed evidence must be "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Indeed, at the summary judgment stage, the Court's role is to determine whether there is a genuine issue available for trial.  There is no issue for trial unless there is sufficient evidence in favor of the non-moving party for a jury to return a verdict for the non-moving party.  *Id.* at 249–50.  "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* (citations omitted).

The Court will first address Capitol's Motion for Summary Judgment, and then turn to Cal Valley's Motion to Strike and Motion for Summary Judgment.  Finally, the Court will briefly address Defendants' Motion to Amend to add a bad faith settlement claim

against Capitol.

## IV.    Capitol's Motion for Summary Judgment (Doc. 95)

Capitol argues that the plain language of the Policy excludes coverage for Calyxt's claims for property damages against Nigh in the Underlying Action.  It also argues that Nigh had no reasonable expectation that his Policy covered such claims.  Defendants argue that the property damage exclusion cannot be enforced because its application is contrary to the reasonable expectations of Nigh.

### A.    The Property Damage Exclusion

Capitol argues that the property damage exclusion plainly applies to Calyxt's claims in the Underlying Action.  The parties agree that Arizona law applies to this case.  Under Arizona law, insurance contracts are interpreted according to their plain and ordinary meaning.  *Keggi v. Northbrook Prop. & Cas. Ins. Co.*, 13 P.3d 785, 788 (Ariz. Ct. App. 2000).  An insurance policy "must be read as a whole, so as to give a reasonable and harmonious effect to all of its provisions." *Charbonneau v. Blue Cross*, 634 P.2d 972, 975 (Ariz. Ct. App. 1981) (citation omitted).  The Court must "construe the written terms of [the policy] to effectuate the parties' intent," and "to protect the reasonable expectations of the insured." *Liberty Ins. Underwriters, Inc. v. Weitz Co.*, 158 P.3d 209, 212 (Ariz. Ct. App. 2007) (citations omitted).  The policy's language "must be viewed from the standpoint of the average layman who is untrained in the law or the field of insurance." *Liristis v. Am. Family Mut. Ins. Co.*, 61 P.3d 22, 25–26 (Ariz. Ct. App. 2002).  "If a clause is susceptible to different constructions, [a court will attempt] to discern the meaning of the clause 'by examining the purpose of the exclusion in question, the public policy considerations involved and the transaction as a whole.'" *State Farm Mut. Auto. Ins. Co. v. Connolly*, 132 P.3d 1197, 1198 (Ariz. Ct. App. 2006) (quoting *Ohio Cas. Ins. Co. v. Henderson*, 939 P.2d 1337, 1339 (Ariz. 1997)).  "If all else fails, and the clause remains ambiguous, the insurance policy will be construed to provide coverage." *Id.*  "Generally, the insured bears the burden to establish coverage under an insuring clause, and the insurer bears the burden to establish the applicability of any exclusion." *Keggi*, 13 P.3d at 788.

Generally, "[t]he interpretation of an insurance contract is a question of law" for the court. *Liristis*, 61 P.3d at 26 (citation omitted); *Sparks v. Rep. Nat'l Life Ins. Co.*, 647 P.2d 1127, 1132 (Ariz. 1982). However, "[i]nterpretation of a contract is a question of law for the court when its terms are unambiguous on its face." *Ash v. Egar*, 541 P.2d 398, 401 (Ariz. Ct. App. 1975); *Chandler Med. Bldg. Partners v. Chandler Dental Grp.*, 855 P.2d 787, 791 (Ariz. Ct. App. 1993). "[I]f there are ambiguities and it is necessary to consider the circumstances in determining its meaning, it is a question for the trier of fact to determine what those circumstances were." *Ash*, 541 P.2d at 401; *see also In re Bataa/Kierland LLC*, 496 B.R. 183, 192 (D. Ariz. 2013) ("Where there is an ambiguity, the trier of fact must determine 'the intent of the parties, based on extrinsic evidence.'") (*quoting Leo Eisenberg & Co., Inc. v. Payson*, 785 P.2d 49, 52 (Ariz. 1989)).

The policy at issue here is Miscellaneous E&O Policy No. SGC0000728-11 (Doc. 95-1 at 3–25)[6] (the "Policy"), which was in effect from March 19, 2020–March 19, 2021. (Doc. 95 at 5).[7] The Policy states that Capitol will cover "**Claims**"[8] against Nigh resulting from "**Erroneous Acts**," including a "negligent act, error or omission," "which results from the performance of **Insured Activities**." (Doc. 95-1 at 6). The Policy defines an "**Erroneous Act**" as "actual or alleged conduct by an **Insured** or by any person or organization for which an **Insured** is legally liable, and which results from the performance of **Insured Activities** for others." (*Id*. at 6). "**Insured Activities** means performance of services for others" and "creation and/or dissemination of **Content** when done in the normal course of performing the specified services." (*Id*. at 8–9). The particular "**Insured Activities**" of Nigh are defined on the Declarations page as "agricultural pest control consulting and recommendation services." (*Id*. at 4). A "Specified Activities Exclusion Endorsement" (*id*. at 20) is attached as an exhibit to the Policy and modifies what is "not

[6] The Policy is also attached as an exhibit to Cal Valley's Motion for Summary Judgment (Doc. 101-1 at 2–60).

[7] The "Named Insured" on the Policy is CRC. (Doc. 95-1 at 4). There is no dispute that as a shareholder, officer, and employee of the Named Insured, Nigh is an "Insured" under the Policy.

[8] Terms are bolded in the Policy.

included in the definition of **Insured Activities**." (*Id*.)  That Endorsement states, in relevant part:

> **PART II EXCLUSIONS** is changed to *include* the following:
>
> The performance of the services listed below are not included in the definition of Insured Activities insured under this Policy and the Company is not liable for Damages or Claims Expenses arising out of the actual or alleged performance of these services:
>
> Insured's activities as a [sic]:
>
> [. . . .]
>
> *Application of pesticides, fertilizers, fungicides, or herbicides.*

(*Id*. at 20 (emphasis added).

Under **EXCLUSIONS Part II.A.1**, the Policy says it excludes coverage for "[c]laims arising out of actual or alleged: 1. Bodily Injury or **Property Damage**" (the "Property Damage Exclusion").  (*Id*. at 6) (emphasis added).  Page four of the Policy defines "**Property Damage**" in pertinent part as "1. injury to, or impairment or destruction of, any tangible property, including the loss of use thereof . . . ." (*Id*. at 9).  The 2019 and 2020 Policy modified the Property Damage Exclusion in another endorsement, which can be found nine pages later and is questionably titled, "Agricultural Consultant Change Endorsement." (*Id*. at 16).[9]  The Agricultural Consultant Change Endorsement says the language defining property damage in Part II A.1., on page four, is to be "deleted in its entirety" and replaced with the following language:

> 1.  a.   Bodily Injury or
>
>     b.   Property Damage, *except this exclusion does not apply to Claims arising out of Erroneous Acts in the performance of Insured Activities for others if the Insured maintains, during this Policy Period, Commercial General Liability Insurance*

---

[9] In its Motion, Capitol refers to this provision as the "Modified Property Damage Exclusion" (Doc. 95 at 9).  The Court will use the title provided in the Policy—"Agricultural Consultant Change Endorsement"—but agrees that "Modified Property Damage Exclusion" is a more apt and unambiguous description of what this section modifies.

> *with a minimum limit of liability of $1,000,000 that includes*
> *products/completed operations coverage and applies to all of*
> *the Insured's operations. . .*

(*Id.*) (emphasis added).  In other words, the provision maintains the previous exclusion for property damage as defined, *unless* the insured maintains a CGL insurance policy for $1 million for "products/completed operations coverage and applies to all of the Insured's operations."[10]

The Court finds that Capitol has met its burden of showing the Property Damage Exclusion on page four and Agricultural Change Consultant Endorsement that replaces the Property Damage Exclusion, as written, apply to the claims alleged by Calyxt against Nigh in the Underlying Action.  Calyxt's claim against Nigh is based on his "erroneous act" of recommending that a client apply certain pesticides on fields that adjoined Calyxt's wheat seed fields.  These recommendations were provided during Nigh's professional services as an agricultural pest control consultant and allegedly caused "injury to, or impairment or destruction of" Calyxt's property when the recommended pesticide was applied during an aerial application to a nearby field.  (Doc. 95-1 at 9).  It is also undisputed that Nigh did not maintain a CGL policy at any time during the Policy period such that this type of claim would be covered under the terms of the Agricultural Change Consultant Endorsement.  On its face, the property damage exclusion applies to Calyxt's claim against Nigh and would exclude this type of coverage.

This conclusion, however, does not end the Court's inquiry on Capitol's request for a declaration of no coverage.  Under Arizona law, summary judgment cannot be entered in favor of an insurer unless it can establish that the reasonable expectations doctrine does not apply to preclude enforcement of the exclusion.  *Darner Motor Sales, Inc. v. Universal Underwriters Ins. Co.*, 682 P.2d 388, 396–97 (Ariz. 1984) (adopting § 211 of Restatement (Second) of Contracts (1981) governing enforceability of boilerplate terms in adhesion

---

[10] The Agricultural Consultant Change Endorsement also contains the same modification found in the Specified Activities Exclusion Endorsement, which modifies the Exclusions in Part II to exclude coverage for "Insured's activities as a [sic]: Application of pesticides, fertilizers, fungicides, or herbicides."  (Doc. 95-1 at 16; 20).

1    contracts). This is where the parties focus their arguments and where the Court now turns.

2         **B.     The Reasonable Expectations Doctrine**

3         "It is well established that a contracting party's reasonable expectations may affect

4    the enforceability of non-negotiated terms in a standardized agreement." *Id.* at 506. In

5    *Darner*, the Arizona Supreme Court recognized the "reasonable expectations" rule of

6    contract interpretation under the Restatement (Second) of Contracts § 211. 682 P.2d at

7    396–97. The doctrine relieves a party from "certain clauses of an agreement which he did

8    not negotiate, probably did not read, and probably would not have understood had he read

9    them." *Id.* at 399. The doctrine does not apply, however, just because the insured

10   experiences the "fervent hope usually engendered by loss." *Id.* at 395.

11        In *Gordinier v. Aetna Casualty & Surplus Company*, the Arizona Supreme Court

12   explained that the doctrine's application was not limited to contracts with ambiguous

13   language. 742 P.2d 277, 283–84 (Ariz. 1987). It held that the doctrine of reasonable

14   expectations will relieve an insured of even unambiguous standardized terms in an

15   insurance agreement under circumstances showing (1) the terms could not "be understood

16   by the reasonably intelligent consumer who might check on his or her rights;" (2) "the

17   insured did not receive full and adequate notice of the term . . . and [the term] is either

18   unusual or unexpected, or one that emasculates apparent coverage;" (3) "some activity

19   which can reasonably be attributed to the insurer would create an objective impression of

20   coverage;" or (4) "some activity . . . [by] the insurer has induced a particular insured

21   reasonably to believe that he has coverage, although such coverage is expressly and

22   unambiguously denied by the policy." *Id.*

23        If no material issue of fact exists in a reasonable expectations case, the issue of

24   whether the policy language should be strictly applied or is subject to the insured's

25   reasonable expectations is a question of law for the Court to decide. *State Farm Mut. Auto*

26   *Ins. Co. v. Falness*, 39 F.3d 966, 967 (9th Cir. 1994). But if there is a question of fact as

27   to whether an exclusion is contrary to an insured's reasonable expectation of coverage, or

28   whether an insured received sufficient notice of a term, then those issues are the jury to

1    decide.  *Averett v. Farmers Ins. Co. of Ariz.*, 869 P.2d 505, 508 (Ariz. 1994).

2         As in *Gordinier*, "[s]everal aspect of the *Darner* rule are implicated" by the facts

3    before the Court.  742 P.2d at 273.  First, though the Court finds the language of the

4    Property Damage Exclusion and Agricultural Consultant Change Endorsement are fairly

5    clear, it is less clear that a reasonably intelligent customer checking on his policy rights

6    would understand that claims for property damage sustained because of his advice would

7    *initially* be excluded from coverage but *could* be covered if he maintained other insurance.

8    The Property Damage Exclusion is bolded and on the first page of the Policy, but is then

9    modified by the Agricultural Consultant Change Endorsement nine pages later.  Yet,

10   nothing on page one indicates that the provision is later modified.  And the title of the later

11   modification, "Agricultural Consultant Change Endorsement," certainly does not indicate

12   to a customer that the Policy is making a change to the definition of property damage on

13   page one.  Though the Endorsement deletes and replaces the definition of property damage

14   on page one in A.1., it does not replace or restate the preceding language in subsection A.,

15   which says, "The Company is not liable for Damages or Claim Expenses or obligated to

16   defend Claims arising out of actual or alleged . . . ."  (Doc. 95-1 at 6).  Failure to include

17   this language in the Agricultural Change Consultant Endorsement means that a customer

18   reviewing the Endorsement would need to flip back and forth between page one and page

19   eleven to understand that the Policy was excluding coverage for claims arising out of

20   property damage unless he obtained a CGL insurance policy for $1 million dollars.  *See*

21   *Gordinier*, 742 P.2d at 273 (noting the average customer might not even notice term when

22   it is inconspicuous and scattered over the policy).

23        Even if reasonably understood, the Property Damage Exclusion and Agricultural

24   Consultant Change Endorsement "certainly could be deemed unexpected or one that

25   emasculates apparent coverage."  *Id.*  The record does not say much about what Nigh asked

26   Cal Valley's predecessor, Sanford & Gilbert, when he originally went about seeking

27   insurance coverage for CRC in 1997.  During his deposition, Nigh explained that through

28   his continuing education as a pest control advisor ("PCA"), he came to understand that

"there was a problem for independent PCAs to get coverage, and so CAPCA[11] stepped in and found some insurance companies and referred me to Sanford & Gilbert." (Nigh Dep., Doc. 103-2 at 42:13-17). He says he asked them for an E&O policy, which he understood to mean that "[i]f I make an error on the [order for a pesticide prescription] or if I have an omission on the [order for a pesticide prescription], it would be covered."[12] (*Id*. at 42:23–24). Nigh said that the aerial application of pesticides was an inherently dangerous business (*id*. at 40:3–7) and that he entirely "relied on [his] brokers to provide [him] with insurance that would cover [him] and [his] business." (*Id*. at 44:14–15, 66:5–7, 88:19–20). He said he "had no reason to expect" and "was completely blown away" that "property damages caused by a pilot who isn't part of [his] business working for a company that's not [his] would somehow be translated to be property damage excluding coverage for [him] for errors and omissions in writing paper." (*Id*. at 99:20-100:21). Defendants argue that Nigh reasonably believed that the exclusion was limited to claims for property damage that Nigh *directly* caused, and that it was unreasonable for a insurer to exclude *all* claims arising out of property damage under an E&O Policy insuring "agricultural pest control consulting and recommendation services." (Doc. 105 at 14; *see also* Doc. 107 at 11 ("interpreting a provision to take away apparent coverage for Nigh's services due to the services performed by the wholly separate aerial applicator would be one that would emasculate apparent coverage for Nigh's conduct"). Cal Valley's insurance industry expert, Mr. Crawford said he understood the purpose of the professional liability insurance needed to cover the nature of Nigh's operations would be to cover claims stemming from Nigh's advice to apply pesticides that ultimately damaged crops. (Doc. 103-5, Crawford Dep. At 71:5-7; 83:23–84:24). He explained that "[i]t's inevitably going to be property damage before there can be a claim. Mr. Nigh can make all kinds of mistakes every day in his work if he wants to, and nothing is going to happen. There's not going to be any claim until there is property

---

[11] CAPCA is the acronym for California Association of Pest Control Advisors.

[12] Nigh testified that he understood he was being sued by Calyxt for incorrectly filling out a 1080 form, which he explained "is a form we file with the State of Arizona like a prescription for an application of pesticide." (Doc. 103-2, Nigh Dep. at 40:10–15).

1    damage." (*Id.* at 88:9–18).  Even Cal Valley's President, Mr. Brian Morrison, agreed that

2    the nature of Nigh's business was "such that if there was an error or omission in consulting,

3    the outcome is inevitably damage to agricultural property and/or crops."  (Doc. 101-1

4    at 49).

5        Capitol, on the other hand, disagrees that the exclusion emasculates apparent

6    coverage because the Policy still covered errors and omissions arising out of personal and

7    advertising errors.  (Doc. 111 at 7).  Capitol will have the opportunity to advance this

8    argument at trial.  But the Court is persuaded that the testimony noted above is sufficient

9    evidence to suggest that excluding all claims arising out of property damage for an

10   insurance policy intended to cover errors and omissions arising out of "agricultural pest

11   control consulting and recommendation services" "is the type of unexpected result that

12   defeats the reasonable expectations of the insured."  *Gorinier*, 742 P.2d at 274.  The fact

13   finder must resolve this issue.  *Averett*, 869 P.2d at 508.

14       The Court also finds that an issue remains as to whether Nigh had sufficient notice

15   of the property damage exclusion.  Nigh says neither the Property Damage Exclusion nor

16   the option to purchase a CGL insurance policy was ever brought to his attention by

17   Cal Valley.  He said he repeatedly had to ask Cal Valley for the Policy, which was paid for

18   around the first of April 2020, but which he did not receive until the end of July 2020.

19   (Nigh Dep., Doc. 95-1 at 65:1–5).  He says prior to tendering the Underlying Action to

20   Capitol, he had never communicated with anyone at Capitol, and instead, all his

21   communications regarding Capitol policies and coverages were with Cal Valley.  (*Id.* at

22   24:2–10).  Nigh testified that oftentimes, months would go by after Nigh had issued Cal

23   Valley a check for a yearly policy before he would receive a copy of the purchased policy.

24   (*Id.* at 64:16-65:20).  Some years, he said he did not receive a copy of the purchased policy

25   at all.  (*Id.* at 64:16-65:20).  But Nigh also said that when he did receive the policies from

26   Cal Valley, he did not read them because he did not understand the terms and conditions.

27   (*Id.* at 65:21–24).  He instead relied on Cal Valley to provide him with the policy that he

28   needed to cover his business.  (*Id.* at 65:21–66:7).  Nigh says Cal Valley never explained

that an exclusion for property damages was part of all his E&O policies.  (*Id.* at 66:17–20).
Nigh also said no one from Cal Valley discussed the Agricultural Consultant Change
Endorsement added in 2019 and 2020 or whether Nigh needed to obtain a CGL policy
insurance to ensure all claims arising out of property damage were covered.

Cal Valley, for its part, does not dispute these statements, but nonetheless opines
through Crawford that "no reasonable insurance broker would ever believe that a carrier
who is providing coverage for someone whose business is to recommend pesticides and
herbicides that could potentially damage a claim would attempt - - would believe that a
carrier would attempt to deny coverage when the very thing that's insured happens.  It's
inevitably going to be a property damage before there can be a claim."  (Crawford Dep.,
Doc. 103-5 at 88–15).

Capitol says this evidence is insufficient to show that Nigh or Cal Valley did not
have full and adequate notice of these provisions.  (Doc. 95 at 18–19).  Capitol asserts that
whether Cal Valley gave policies to Nigh and whether Nigh read them "is irrelevant to this
[notice] analysis as delivery of the policies to Cal Valley constitutes delivery to Nigh."  (*Id.*
at 19 (citing *Tarleton v. De Veuve*, 113 F.2d 290, 295 (9th Cir. 1940)).  It says that because
Cal Valley does not dispute it received each policy from Capitol, its receipt "constitutes
Nigh's receipt and possession of the policies."  (*Id.*)

The Court disagrees that undisputed "delivery" of the policies to Cal Valley means
Nigh had notice of the Policy's property damage exclusion for purposes of determining an
insured's reasonable expectations of coverage.  The issue in *Tarleton v. De Veuve* was
whether there was an enforceable contract under California law when the insurance policy
at issue had only been delivered to the insured's broker, and not the insured.  113 F.2d at
295.  That case did not address the reasonable expectations doctrine or any of the policy
reasons for the doctrine's application to insurance contracts.  *See Darner*, 682 P.2d at 390
("[W]e must remember that the usual insurance policy is a special kind of contract.  It is
largely adhesive; some terms are bargained for, but most terms consist of boilerplate, not
bargained for, neither read nor understood by the buyer, and often not even fully understood

by the selling agent.").  Under these circumstances, the Court finds it improper to charge Nigh with sufficient notice of a property damage exclusion merely because it is undisputed that his broker obtained the Policy from the insurer.

Thus, the disagreement over whether Nigh had adequate notice also makes summary judgment improper.  If a jury finds Nigh did not have notice of the property damage exclusion, and that the dominant purpose of the Policy was emasculated by the property damage exclusion, then the reasonable expectations doctrine indeed may apply. Accordingly, Capitol's Motion is denied.

## V.    Cal Valley's Motion to Strike (Doc. 84)

The Court will next address Cal Valley's Motion to Strike Nigh's designation of Mr. Jamieson as a commercial insurance broker under Federal Rule of Civil Procedure 26(a)(2)(A) and Arizona Local Rule 7.2(m)(1).  (Doc. 84 at 1)[13]  Cal Valley argues Nigh's designation of Mr. Jamieson is untimely and deficient and that Nigh should be sanctioned under Rule 37(c)(1) such that any purported expert testimony by Mr. Jamieson should be precluded at trial.  (*Id*. at 1).  Nigh argues he properly disclosed Mr. Jamieson as an expert or, alternatively, that any disclosure deficiency on his part was harmless.  (Doc. 85 at 2). The Court agrees with Nigh.[14]

### A.    Legal Standards for Expert Disclosures

Rule 26(a)(2)(B)[15] establishes the disclosure requirements for witnesses who are "retained or specially employed to provide expert testimony" in civil matters.  Fed. R. Civ. P. 26(a)(2)(B).  Unless otherwise stipulated or ordered by the court, the disclosure of an expert witnesses must be accompanied by a written report that contains the following

---

[13] Local Rule 7.2(m)(1) provides that "a motion to strike may be filed only if it is authorized by statute or rule, such as Federal Rules of Civil Procedure 12(f), 26(g)(2) or 37(b)(2)(A)(iii), or if it seeks to strike any part of a filing or submission on the ground that it is prohibited (or not authorized) by a statute, rule, or court order."  LRCiv. 7.2(m)(1).

[14] Calyxt also filed a Response to Cal Valley's Motion to Strike (Doc. 86), which Cal Valley argues is improper because Calyxt lacks standing.  (Doc. 88 at 2).  Given the subsequent assigned of Nigh's claims to Calyxt's successor, the Court finds this argument moot.

[15] Unless where otherwise noted, all Rule references are to the Federal Rules of Civil Procedure.

components:

    (i)     a complete statement of all opinions the witness will express and the basis and reasons for them;

    (ii)    the facts or data considered by the witness in forming them;

    (iii)   any exhibits that will be used to summarize or support them;

    (iv)   the witness's qualifications, including a list of all publications authored in the previous 10 years;

    (v)    a list of all other cases in which, during the previous 4 years, the witness testified as an expert at trial or by deposition; and

    (vi)   a statement of the compensation to be paid for the study and testimony in the case.

Fed. R. Civ. P. 26(a)(2)(B).  Expert disclosures must be made according to the deadlines set by the court.  *Id*. 26(a)(2)(D).

Rule 37(c)(1) provides the court may sanction a party who fails to comply with requirements of Rule 26(a)(2)(B) so that they are "not allowed to use that information or witness . . . *unless* the failure was substantially justified or is harmless."  *Id*. 37(c)(1) (emphasis added).  In lieu of or in addition to this exclusion sanction, the court "may impose other appropriate sanctions," including "striking pleadings in whole or in part."  *Id*. 37(c)(1)(C) (citing *id*. 37(b)(2)(A)(iii)).  "Rule 37(c) 'gives teeth' to the requirements of Rule 26(a) . . . so courts are given a particularly wide latitude to issue sanctions under Rule 37(c)(1)." *Carrillo v. B & J Andrews Enterprises, LLC*, 2013 WL 394207, *6 (D. Nev. Jan. 29, 2013) (finding that the plaintiff's late and deficient expert disclosures were not substantially justified but nonetheless harmless because the defendant had ample notice of the disclosure and adequate time to conduct other discovery) (quoting *Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1106 (9th Cir. 2001)).  Otherwise, the exclusion sanction is generally "self-executing" and "automatic."  *Hoffman v. Constr. Protective Servs., Inc.*, 541 F.3d 1175, 1180 (9th Cir. 2008).

/ / /

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**B.      Timeline of Relevant Facts**

The final deadline for Nigh's expert disclosures was January 27, 2023 (Doc. 63),[16] and the final expert deposition deadline was July 5, 2023 (Doc. 83).  Below is a timeline of the events relevant to Nigh's disclosure efforts:

> March 22, 2022: Nigh filed a Motion for Summary Judgment against Cal Valley (Docs. 32; 33) ("Nigh's Prior Motion"), attaching by way of expert support a "Declaration by Jeff Jamieson" (Doc. 33 at 7–9) ("Mr. Jamieson's Declaration") and Mr. Jamieson's curriculum vitae (*id*. at 10–13).  The Court ultimately denied Nigh's Prior Motion as entirely premature and wholly deficient.  (Doc. 67).  In so ruling, the Court declined to consider Mr. Jamieson's Declaration because it was comprised of baseless conclusions unsupported by any facts or concrete evidence.  (*Id*. at 7).  The Court found Nigh's arguments insufficient under Rule 56 standards.  (*Id*. at 4–10).

> January 27, 2023: Deadline for Nigh's expert disclosure (Doc. 63).

> April 14, 2023: Nigh filed a Notice of Expert disclosures (Doc. 75) under Rule 26(a)(2), stating that "Jeff Jamieson's declaration and qualifications were disclosed and attached to Defendant Nigh's Motion for Summary Judgment Against Third Party Defendant Cal Valley Insurance Services, Inc. filed on March 28, 2022.  Nigh incorporates these materials by refence [sic]." (*Id*. at 2).  On May 12, 2023, Nigh amended his disclosures to add a retroactive engagement letter for Mr. Jamieson that was backdated to March 22, 2022.  (Doc. 80).  Calyxt later noticed a deposition of Mr. Jamieson for June 30, 2023.

> June 29, 2023: The day before Mr. Jamieson was scheduled to be deposed, Cal Valley filed the present Motion to Strike Mr. Jamieson's expert disclosures and preclude his testimony at trial.  (Doc. 84).

> June 30, 2023: Expert depositions were held for Mr. Jamieson and Cal Valley's insurance industry expert, Dale C. Crawford.  (*Id*. at 3).  Cal Valley had agreed to extend deposition deadlines to accommodate its own expert, but opposed the deposition of Mr. Jamieson due to Nigh's untimely disclosure.  (*Id*. at 3–4).  All parties attended this deposition despite Cal

---

[16] The initial deadline for Nigh's "full and complete expert disclosures as required by Rule 26(a)(2)" was October 31, 2022.  (Docs. 18 at 5; 19 at 3).  Over Nigh's objections, the Court granted Capitol's request to modify the expert and dispositive motion deadlines, which resulted in extension of Nigh's expert disclosure deadline to December 31, 2022. (Docs. 52 at 2; 58 at 2).  The Court later granted Cal Valley's request for further extensions of time, which resulted in extension of Nigh's expert disclosure deadline to January 27, 2023.  (Docs. 62; 63).

Valley's conferral with Calyxt that Calyxt only noticed the deposition "in the event the Court would permit the opinion to stand." (*Id*. at 5).

The issue before the Court is two-fold: (1) whether Nigh's disclosures satisfied the time and substance requirements of Rule 26(a)(2)(B); and (2) if not, whether Nigh's deficient disclosures were harmless. *See* Fed. R. Civ. P. 2626(a)(2)(B); 37(c)(1).

### C.  Whether Nigh's Expert Disclosure Complied with Rule 26

Cal Valley argues that Nigh's disclosure of Mr. Jamieson as an expert on April 24, 2023, and supplements thereto, are untimely by over two months. (Doc. 84 at 4). Cal Valley further contends that Nigh cannot rely on Mr. Jamieson's Declaration as a written report because the Court has already found the Declaration is comprised of "baseless legal conclusions." (*Id*. at 4 (quoting Doc. 67 at 7)). Nigh argues he properly disclosed Mr. Jamieson as a commercial insurance broker expert through his Prior Motion. (Doc. 85 at 2).

The Court finds that Nigh's disclosure of Mr. Jamieson's identity and curriculum vitae through his Prior Motion was sufficient to put Cal Valley on notice of his intent to rely on Mr. Jamieson as an expert witness under Rule 26(a)(2)(B). (Doc. 33 at 10–13). However, Mr. Jamieson's Declaration does not meet the remaining written report requirements. The Declaration is comprised of nine paragraphs—three of which recite factual statements regarding the relevant Policy language, and five of which articulate Mr. Jamieson's opinions that Cal Valley was negligent in procuring the Policy for Nigh because those acts fell below the applicable standard of care. (Doc. 33 at 7–9). The Declaration does not meaningfully state the reasons and bases for Mr. Jamieson's opinions nor identify exhibits that will be used at trial. *See* Fed. R. Civ. P. 26(a)(2)(B)(i), (iii). Moreover, Nigh did not supplement Cal Valley with Mr. Jamieson's compensation agreement until after his expert disclosure deadline. (Doc. 80). *See* Fed. R. Civ. P. 26(a)(2)(B)(vi).

Overall, the Court finds that Nigh's piecemealed disclosures were untimely and incomplete and he failed fully comply with the disclosure requirements of Rule 26. / / /

**D.      Whether Nigh's Deficient Disclosure was Harmless Under Rule 37**

Once it is determined, as here, that a party has failed to provide information required by Rule 26(a) then "the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or harmless." Fed. R. Civ. P. 37(c)(1).  Nigh argues that his disclosures, albeit deficient, were harmless because he disclosed Mr. Jamieson as an expert to Cal Valley in March 2022, which is ten months prior to Nigh's expert disclosure deadline.  (See Doc. 85 at 2–3).  As a result, he says that Cal Valley had ample notice and thus sufficient opportunity to retain their own expert and depose Mr. Jamieson, which they did.  (*Id*. at 2).

To evaluate whether a violation of a discovery deadline is substantially justified or harmless, a court should weigh the following factors: "(1) prejudice or surprise to the party against whom the evidence is offered; (2) the ability of that party to cure the prejudice; (3) the likelihood of disruption of the trial; and (4) bad faith or willfulness involved in not timely disclosing the evidence." *Lanard Toys Ltd. v. Novelty, Inc.*, 375 F. App'x 705, 713 (9th Cir. 2010).  The party facing the exclusion sanction has the burden of showing that any failure to disclose is substantially justified or harmless.  *See Yeti*, 259 F.3d at 1107.

The Court agrees with Nigh that his deficient disclosures were harmless.  Nigh made Cal Valley aware of his intent to rely on Mr. Jamieson as an expert, Mr. Jamieson's intended opinions, and Mr. Jamieson's curriculum vitae ten months before Nigh's expert disclosure deadline and sixteen months before the expert deposition deadline.  Thus, Cal Valley cannot claim surprise.  Furthermore, any prejudice posed to Cal Valley was cured because Cal Valley had a generous period to engage in discovery on Mr. Jamieson's intended opinions and it also deposed Mr. Jamieson.  *See Lister v. Hyatt Corp.*, 2019 WL 6701407, *8 (W.D. Wash. Dec. 9, 2019) ("[I]f [the defendant] believed [the plaintiff's] expert disclosures were inadequate, [the defendant] could have inquired into the statements it believed were inadequate within the discovery period."); *Sempra Energy v. Marsh USA, Inc.*, 2008 WL 11335050, *8 (C.D. Cal. Oct. 15, 2008) (finding no harm because there was an opportunity to depose the late disclosed expert on his opinions).  Cal Valley raises that

it only asked four questions at Mr. Jamieson's deposition, but its failure to diligently participate cannot be attributable to Nigh. *Reed v. Sandstone Props., Ltd. P'ship*, 2013 WL 1344912, *5 (C.D. Cal. Apr. 2, 2013) ("Federal courts have been reluctant to exclude evidence at summary judgment when a party has slept on [her] rights in discovery."); *see also Dhaliwal v. Singh*, 2014 WL 2957310, at *7 (E.D. Cal. 2014) (holding that a "technical violation of Rule 26" was harmless when plaintiff was not diligent in seeking to take the deposition of a witness).[17]   Although Nigh's expert witness disclosures were "haphazard and incomplete" the Court finds that he provided enough information to Cal Valley early enough in the discovery period such that any deficiencies in his disclosures were harmless. *Lister*, 2019 WL 6701407, *7 (holding that even though the plaintiff's written reports were untimely, did not contain full and complete statements of the experts' opinions or underlying bases, did not adequately state the facts and data upon which the experts relied on, and did not contain a list of the exhibits the experts intended to use at trial, the plaintiff "provided enough information to [the defendant] early enough in the discovery period that any deficiencies in her disclosures were harmless").

Despite  Nigh's failure to fully comply with Rule 26(a)(2)(B) and therefore,  subject to sanctions, the Court finds his failure was harmless and declines to wholly exclude Mr. Jamieson's expert testimony under Rule 37(c)(1).  Even so, "[a party] should not obtain a strategic litigation advantage because of [his]own failure." *Carrillo*, 2013 WL 394207, *7.  The Court will limit Mr. Jamieson's testimony to the subject matter of his opinions disclosed in his Declaration. *Id*.  Cal Valley's Motion to Strike will therefore be granted in part and denied in part.

**VI.    Cal Valley's Motion for Summary Judgment (Doc. 84)**

The Court finally turns to Cal Valley's Motion for Summary Judgment[18] on Nigh's

---

[17] Notably Cal Valley waited until the eve of Mr. Jamieson's deposition to bring the issue to the attention of the Court.  (*See* Doc. 19 at 4 (describing the Court's discovery dispute protocol)).

[18] Cal Valley argues the Court should disregard Calyxt's Response to its Motion for Summary Judgment because Calyxt lacks standing. (Doc. 112 at 2).  The position ignores that Nigh and CRC filed a Joinder to that Response (Doc. 104).  Ultimately, however, the Court need not address this argument because it concludes, *infra*, that Cal Valley's Motion

professional negligence claim, which alleges that Cal Valley breached its professional duties in procuring the Policy on Nigh's behalf.  (Doc. 15 at 3–4).  "[A]n action in negligence may be maintained upon the plaintiff's showing that the defendant owed a duty to him, that the duty was breached, and that the breach proximately caused an injury which resulted in actual damages."  *Flagstaff Affordable Hous. Ltd. P'ship v. Design All., Inc.*, 223 P.3d 664, 671 (Ariz. 2010) (citation omitted).  Cal Valley argues it is Capital that is liable for incorrectly denying Nigh coverage for Calyxt's claims in the Underlying Action, and so Nigh cannot prove causation as a matter of law.[19]  (Doc. 101 at 9–14).  Cal Valley further argues it is undisputed that its actions as Nigh's insurance broker met the applicable standard of care.  (*Id*. at 14–17).  The Court will address each of Cal Valley's arguments in turn.

### A.    Causation

In assessing Cal Valley's causation argument, it is important to start with the relationship between Nigh's Third-Party Complaint against Cal Valley and Nigh's Counterclaim against Capitol.  Cal Valley summarizes its understanding of Nigh's claims as follows:

> The express language of the Counterclaim is a prayer for a finding of coverage. The prayer for relief also requests all costs and attorneys' fees, such that Nigh is made whole if successful.  If successful, the case is over. The Third-Party claim against Cal Valley is asserted only with a judgment of no coverage. Any pursuit of Cal Valley with a finding of coverage is an improper attempt at double recovery and would be subject to judicial estoppel.

---

for Summary Judgment should be denied irrespective of the points made in the Responses.

[19] Cal Valley also argues Nigh's Third-Party Complaint must fail as a matter of procedure because A.R.S. 12-2602(A) requires Nigh's claim be supported by expert testimony, yet Nigh has failed to disclose an expert in compliance with Rule 26(a)(2).  (Doc. 101 at 8–9). Cal Valley largely reiterates the arguments in its Motion to Strike.  (Doc. 112 at 4).  But as settled *supra*, the Court finds that Nigh's failure to comply with Rule 26(a)(2)(B) was harmless and thus will not exclude Mr. Jamieson's expert testimony under Rule 37(c)(1). *See supra* Section V.  Because Mr. Jamieson can testify at trial to his opinions that Cal Valley was negligent in procuring Nigh with the Policy and fell below the applicable standard of care, Nigh's claim can proceed under A.R.S. 12-2602(A).

(Doc. 112 at 3) (internal citations omitted).   Considering Cal Valley's reasoning that it cannot be found liable if Capitol is obligated to cover under the Policy, Cal Valley spends the majority of its Motion for Summary Judgment arguing Capitol has a duty to defend Nigh against Calyxt's claims in the Underlying Action under both the plain language of the policy and the reasonable expectation doctrine. (Doc. 101 at 9–14).   Cal Valley's theory is that "[s]ince coverage should be provided [by Capitol] based on the terms of the subject policy, any alleged act or omission of Cal Valley cannot result in any damage or harm, such that no causation exists."   (*Id.* at 14).   Thus, Cal Valley's causation argument is directly dependent on the Court's finding that Capitol must cover Nigh.

Cal Valley essentially posits that Nigh's professional negligence claim must fail because Capitol's claim for a declaration of no coverage must fail.   But, as explained *supra*, the Court will deny Capitol's Motion for Summary Judgment because disputes of fact remain as to whether Nigh had a reasonable expectation that he would be covered if sued for property damage claims like the ones at issue in the Underlying Action.   *See supra* Section IV.B.   These disputes of fact also prevent the Court from assessing whether Cal Valley is entitled to Nigh's Third-Party Complaint for lack of causation as a matter of law.

### B.   Duty and Breach

Cal Valley further argues it did not breach its duty owed to Nigh as his insurance broker when procuring him an errors and omissions policy through Capitol. (Doc. 101 at 14–17).   Under Arizona law, "[a]n insurance agent owes a duty to the insured to exercise reasonable care, skill and diligence in carrying out the agent's duties in procuring insurance."   *Southwest Auto Painting and Body Repair, Inc. v. Binsfield*, 904 P.2d 1268, 1271 (Ariz. Ct. App. 1995) (quoting *Darner*, 682 P.2d at 397).   Cal Valley's assertion that it met the applicable standard of care rests on its theory that Capitol's enforcement of the Property Damage Exclusion is erroneous. (Doc. 101 at 15).   In Cal Valley's opinion, it "did not have an obligation to discuss the property damage exclusion with Nigh because [the exclusion] did not reasonably apply to the business of CRC, consulting."   (*Id.* at 16).   Cal Valley states that it "never considered the denial of coverage to CRC for the allegations

1   of Calyxt negligence suit to be a reasonable determination of coverage." (*Id*. at 15).

2        But issues of fact remain as to whether Nigh's expectation of coverage was

3   reasonable and whether he had notice of the Property Damage Exclusion in the first

4   instance, both which are material to Cal Valley's duty as Nigh's insurance broker.

5   Summary judgment is improper for these reasons.

6   **VII.   Defendants' Motion to Amend (Doc. 115)**

7        As noted, on November 7, 2023, Defendants filed a Motion seeking leave to add a

8   bad faith failure to settle claim to their Counterclaim against Capitol.  Judgment was

9   entered against Nigh for $1,800,000.00 in the Underlying Action on September 26, 2023.

10   Defendants indicate that the Motion is opposed, but Capitol has not filed a response.  A

11   response would aid this Court, particularly now that the parties' dispositive motions have

12   been resolved.  The Court will order Capitol to file one in due course.

13   **VIII.  Conclusion**

14        The express terms of Nigh's Policy supports Capitol's refusal to defend or indemnify

15   Nigh for claims asserted by Calyxt against Nigh in the Underlying Actions.  However,

16   issues of fact remain as to whether the Policy's Property Damage Exclusion "could be

17   deemed unexpected or one that emasculates apparent coverage"  and whether Nigh had

18   adequate notice. *See Gordinier*, 742 P.2d at 273.  Therefore, Capitol is not entitled to

19   summary judgment on its declaratory action because a jury must determine whether Nigh

20   had a reasonable expectation of coverage such that the Property Damage Exclusion should

21   not apply. *See Averett*, 869 P.2d at 508.  Cal Valley is not entitled to summary judgment

22   for similar reasons.  Regarding Cal Valley's Motion to Strike, the Court will not exclude

23   Mr. Jamieson's expert testimony under Rule 37(c)(1), but will limit Mr. Jamieson's

24   testimony to the subject matter of his opinions disclosed in his Declaration.  Finally, the

25   Court will order Capitol file a Response to Defendants' Motion to Amend within fourteen

26   (14) days of this Order.

27        Accordingly,

28   / / /

**IT IS ORDERED:**

(1)   Plaintiff Capitol Specialty Insurance Corporation's Motion for Summary Judgment (Doc. 95) and Motion to Strike (Doc. 110) are **DENIED**;

(2)   Defendant/Counterclaimant Calyxt, Inc.'s Motion for Leave to File Deposition Transcript (Doc. 89) is **DENIED**;

(3)   Third Party Defendant Cal Valley Insurance Service Inc.'s Motion to Strike (Doc. 84) is **GRANTED in part** and **DENIED in part** as stated herein. To the extent Mr. Jamieson will testify at trial, his testimony shall be limited to the subject matter of his opinions disclosed in his Declaration, filed at Doc. 33 at 7–9;

(4)   Third Party Defendant Cal Valley Insurance Service Inc.'s Motion for Summary Judgment (Doc. 101) is **DENIED**; and

(5)   The Motion to Amend (Doc. 115) filed by Defendants Nigh, Colorado River Consulting, Inc., and Calyxt Inc. shall be resolved by subsequent Order. Plaintiff Capitol Specialty Insurance Corporation shall file a response or a notice of non-opposition to Defendants' Motion to Amend (Doc. 115) **within fourteen (14) days of this Order**. Defendants may file a reply in support of their Motion to Amend seven (7) days thereafter.

**IT IS FINALLY ORDERED** that the parties are directed to comply with Paragraph 10 of the Rule 16 Scheduling Order (Doc. 19 at ¶ 10) regarding notice of readiness for pretrial conference. Upon a joint request, the parties may also seek a referral from the Court for a settlement conference before a Magistrate Judge.

Dated this 30th day of March, 2024.

Honorable Diane J. Humetewa
United States District Judge